DJW/bh

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MEITLER CONSULTING, INC.,**

                                        **Plaintiff,**

                                                                    **CIVIL ACTION**

**v.**

                                                                    **No. 05-2126-DJW**

**GARY L. DOOLEY, individually**
**and as owner of East Texas Environmental**
**Services, a Texas-based sole proprietorship,**
**a/k/a ET Solutions, et al.,**

                                        **Defendants.**

## MEMORANDUM AND ORDER

An evidentiary hearing was held on February 6, 2007 regarding Plaintiff's Amended Application for Default Judgment (doc. 45). Plaintiff appeared in person through its president and owner, Brian Meitler, and through its counsel David A. Rameden. Defendant Gary L. Dooley did not appear, although he confirmed that he had received notice of the hearing.[1] There were no other appearances.

### I.      Background Information and Procedural History

Plaintiff filed its Complaint on March 31, 2005, asserting claims for breach of contract (Count I), conversion (Count II), and misappropriation of trade secrets (Count III). The Complaint seeks compensatory and punitive damages, in addition to injunctive relief and attorney fees.

Plaintiff has sued not only Gary Dooley but also East Texas Environmental Services ("East Texas"). The Complaint alleges that East Texas is a sole proprietorship owned by Mr. Dooley.

---

[1]In a January 25, 2007 e-mail to the Court, Mr. Dooley indicated that he had received notice of the hearing.

Nothing in the record indicates that Plaintiff has ever served East Texas, and East Texas has not entered an appearance in this case.

Plaintiff provides environmental consulting services to companies that create industrial wastewater and operate wastewater treatment systems.  In addition to providing consulting services, Plaintiff sells certain products, known as flocculents, which are chemicals added to wastewater to help remove emulsified and suspended solids from the wastewater.[2]

With respect to its breach of contract claims, Plaintiff alleges that Mr. Dooley breached certain confidentiality and restrictive covenants found in a written brokerage agreement ("Brokerage Agreement") executed by Plaintiff and Mr. Dooley in February 2004.  Pursuant to that Brokerage Agreement, Mr. Dooley agreed to market and sell Plaintiff's products and to service Plaintiffs customers as an independent contractor, on a commission basis.  He also agreed not to use or disclose any of Plaintiff's confidential information, such as customer lists, customer leads, pricing lists, and sources of supply for an indefinite period of time, and agreed not to compete against Plaintiff for one year after termination of the Brokerage Agreement.  He also agreed not to solicit any of Plaintiff's customers for two years after termination of the Brokerage Agreement.

 In the early fall of 2004, Mr. Dooley entered into an oral contract with Plaintiff to design and implement a website for Plaintiff ("Website Contract").  The purpose of the website was to generate customer leads and inquiries to facilitate the sale of Plaintiff's products and services. Pursuant to the terms of the Website Contract, Mr. Dooley was not to capitalize on any such website leads to obtain sales or commissions on his own behalf.  Rather, Mr. Dooley was to review, on

---

[2]Compl. (doc. 1), ¶ 9.

behalf of Plaintiff, any inquiries and business leads arising from the website and forward all of them to Brian Meitler, Plaintiff's president and owner.

On September 16, 2004, Plaintiff and Mr. Dooley terminated the Brokerage Agreement by mutual consent. Plaintiff and Mr. Dooley then entered into a written employment agreement ("Employment Agreement"). The Employment Agreement provided that the restrictive covenants and confidentiality provisions of the Brokerage Agreement survived termination of the Brokerage Agreement. The Employment Agreement contained additional restrictive covenants that prevented Mr. Dooley from (1) competing with Plaintiff for one year after termination of the Employment Agreement within a ten-state area; and (2) soliciting any of Plaintiff's current or former customers for a one-year period after termination of the Employment Agreement.

At some point in time after September 16, 2004 (the date Mr. Dooley became an employee of Plaintiff), Plaintiff withdrew its authorization for Mr. Dooley to preview leads from the website and notified Mr. Dooley that all website-based leads were to be routed to Mr. Meitler, without Mr. Dooley viewing them. Plaintiff also requested that Mr. Dooley restructure the website to ensure that all inquiries were automatically routed to Mr. Meitler. Mr. Dooley failed to comply with Plaintiff's directive, and Mr. Dooley and East Texas continued to have exclusive access to the inquiries and business leads sent to or generated by the website.

In March or April 2005, Plaintiff learned that Mr. Dooley was diverting potential customers away from Plaintiff and to East Texas' website. As a consequence, Plaintiff's terminated Mr. Dooley's employment on April 9, 2005. After his termination, Mr. Dooley contacted Plaintiff's customers in violation of the non-solicitation provisions of the Brokerage and Employment

Agreements.  Mr. Dooley also diverted or withheld from Plaintiff several hundred or more customer inquiries and leads generated by the website.

Plaintiff filed this lawsuit against Mr. Dooley on March 3, 2005.  The Complaint asserts the following claims:

**Breach of Contract**:

- Dooley breached the oral Website Contract and the Employment Agreement by refusing to modify the website and refusing to comply with Plaintiff's directive that all inquiries to the website were to be sent directly to Mr. Meitler.[3]
- Dooley breached the Employment Agreement by refusing to provide Plaintiff with the password necessary to make changes to the website and by refusing to relinquish system administrator control to an individual of Plaintiff's choosing.[4]
- Dooley breached the Employment Agreement by diverting and withholding the customer inquiries and customer leads generated by Plaintiff's website for Defendants' benefit or for the benefit of Plaintiff's competitors, to the detriment of Plaintiff.[5]
- Dooley breached the Employment Agreement by disclosing the confidential customer inquiries and customer leads generated by Plaintiff's website to others, depriving Plaintiff of sales and profits.[6]
- Dooley breached the Brokerage and Employment Agreements by soliciting business for waste water treatment on behalf of East Texas.[7]

---

[3]Compl., ¶ 43, 44.

[4]*Id.*, ¶ 45.

[5]*Id.*, ¶ 47, 48.

[6]*Id.*, ¶ 49.

[7]*Id.*, ¶ 50.

**Conversion**

- Dooley deprived Plaintiff of the customer leads and inquiries that were to be directed to Plaintiff by denying Plaintiff access to the website password and refusing to relinquish system administrator control to Plaintiff.[8]
- Dooley wrongfully assumed and exercised the right of ownership and control over Plaintiff's website and wrongfully excluded Plaintiff from exercising its full property rights.

**Misappropriation of Trade Secrets**

- Dooley diverted or withheld several hundred or more customer inquiries and leads from Plaintiff's website.[9]
- Dooley used those inquiries and leads to general sales for Defendants' benefit or the benefit of Plaintiff's competitors, to Plaintiff's detriment.[10]
- Dooley disclosed the customer inquiries and leads from Plaintiff's website to others.[11]

Plaintiff filed a Motion for Temporary Restraining Order ("T.R.O.") (doc. 2) on April 20, 2005. An evidentiary hearing regarding the request for restraining order was held on May 17, 2005. Although Mr. Dooley received notice of the hearing, he was not present at the hearing. On May 18, 2007, the Court entered a T.R.O. against Mr. Dooley (doc. 13), which, *inter alia*, prohibited him from participating in or being employed by any competitor of Plaintiff and from selling any competing clay-based flocculents within the ten-state area set forth in the Employment Agreement. It also prohibited Mr. Dooley from soliciting any customer of Plaintiff that had done business with Plaintiff between April 9, 2004 and April 9, 2005. In addition, Mr. Dooley was prohibited from

---

[8]*Id.*, ¶ 54.

[9]*Id.*, ¶ 66.

[10]*Id.*, ¶ 67.

[11]*Id.*, ¶ 68.

divulging any confidential information of Plaintiff, including its customer and pricing lists, manufacturing formulas, and sources of supply.

On February 6, 2006, the Court entered default judgment against Mr. Dooley as a sanction for failing to appear for his deposition and failing to respond to the Court's December 13, 2006 Show Cause Order.[12]   The Court directed Plaintiff to file, pursuant to Federal Rule of Civil Procedure 55(b)(2), "an application for default judgment and documentation that would permit the Court to determine the amount and nature of the judgment to be entered against Mr. Dooley."[13]  The Order indicated that, after reviewing the application, the Court would determine whether a hearing was necessary.

Plaintiff filed an Amended Application for Default Judgment (doc. 45) on March 1, 2006, requesting that the Court do the following:

  1.      Enter judgment in favor of Plaintiff on its breach of contract, conversion and trade secret misappropriation claims;

  2.      Enter judgment in favor of Plaintiff on its request for injunctive relief (tracking Paragraphs 1-3 of the T.R.O. (doc. 13));

  3.      Award Plaintiff $25,400 in compensatory damages;

  4.      Find that Mr. Dooley acted willfully and maliciously and award Plaintiff punitive damages in the amount of $50,000; and

  5.      Award Plaintiff attorney fees pursuant to K.S.A. 60-3323, which provides for the award of attorney fees for willful and malicious misappropriation of trade secrets.[14]

---

[12]*See* Mem. & Order, Feb. 6, 2006 (doc. 41).

[13]*Id.* at 7.

[14]Pl.'s Am. Application for Default J. (doc. 45) at p. 18.

Mr. Dooley filed no response to the Amended Application for Default Judgment.

On November 1, 2006, the Court issued a Memorandum and Order (doc. 47) regarding Plaintiff's Amended Application.  In its Order, the Court accepted as true Plaintiff's allegations that Mr. Dooley had breached the Brokerage and Employment Agreements and the oral Website Contract.  The Court also accepted as true Plaintiff's allegations that Mr. Dooley converted Plaintiff's website and misappropriated Plaintiff's trade secrets, i.e., the customer inquiries and leads generated by Plaintiff's website.  Thus, the Court found there was no need to hold a hearing with respect to Mr. Dooley's *liability* for the claimed  breach of contract, conversion, and misappropriation of trade secrets.

Similarly, the Court accepted as true Plaintiff's claims that Mr. Dooley acted wilfully and maliciously.  The Court therefore held that Mr. Dooley could be held liable for punitive and exemplary damages pursuant to K.S.A. 60-3702 and 60-3322(b), and liable for attorney fees pursuant to K.S.A. 60-3323.  The Court therefore concluded that there was no need to hold a hearing with respect to Mr. Dooley's *liability* for punitive and exemplary damages and attorney fees.  The Court did, however, rule that it was necessary to hold an evidentiary hearing to determine the *amount* of Plaintiff's compensatory and punitive damages.

 In addition, the Court concluded that Plaintiff is entitled to an order granting it injunctive relief.  The Court indicated that it would enter the injunction at the time the Court entered its order regarding the amount of Plaintiff's damages. In addition, the Court directed Plaintiff to file an application setting forth the amount of attorney fees requested, with supporting time records, affidavits or other evidence.

As noted above, the Court held an evidentiary hearing regarding Plaintiff's Amended Application for Default Judgment on February 6, 2007. Two weeks thereafter, Plaintiff filed its application for attorney fees (doc. 53) on February 20, 2007. Mr. Dooley has not responded to that application.

Having reviewed Plaintiff's Amended Application for Default Judgment, having heard and reviewed the evidence and argument presented by Plaintiff at the February 6, 2007 default judgment hearing, having reviewed the unanswered discovery requests served on Mr. Dooley, and having reviewed Plaintiff's Application for Attorney Fees, the Court is now prepared to rule regarding the amount of Plaintiff's damages and attorney fees and to enter an order regarding injunctive relief.

## II.     Compensatory Damages

### A.     Amount Sought by Plaintiff

The Complaint alleges that Mr. Dooley's wrongful conduct caused Plaintiff to lose sales and profits and business opportunities, the value of which exceeds $75,000.[15] Plaintiff's Complaint seeks compensatory damages in excess of $75,000 on each of its causes of action for "missing out on untold numbers of customer leads," and lost sales and profits.[16] In its Amended Application for Default judgment, Plaintiff indicated that it is seeking to recover compensatory damages in the amount of $25,400 "as a result of Dooleys' breach of contract and trade secret misappropriation."[17] At the hearing, however, Plaintiff's counsel indicated that Plaintiff had recalculated its compensatory damages and that it is now seeking to recover approximately $35,000 in compensatory damages.

---

[15] Compl. (doc. 1), ¶¶ 51.

[16] *Id.*, ¶¶ 51, 57-58, 70.

[17] Am. Application for Default J. (doc. 45) at p. 10.

Plaintiff maintains that the $35,000 figure represents an approximation of the profits Plaintiff would have made had Mr. Dooley not breached the various agreements he had with Plaintiff and not misappropriated Plaintiff's trade secrets, which caused Plaintiff to lose the business of two customers, Columbus Container Inc. ("Columbus Container") and Smurfit Stone Fresno Corporation ("Smurfit-Fresno"). Plaintiff also contends that it is entitled to $35,000 in damages based on Plaintiff's breach of the T.R.O. because Mr. Dooley diverted Colombus Container and Smurfit-Fresno's business from Plaintiff.[18]

More specifically, Plaintiff asserts that its claimed compensatory damages are based on the profits that would have been generated by sales of its clay flocculent products to Columbus Container and Smurfit-Fresno during the two year non-compete period that followed Mr. Dooley's termination from Plaintiff, i.e., during the period April 9, 2005 through April 9, 2007.[19] Plaintiff's counsel explained at the default judgment hearing that the increase in its claim from $25,400 to

---

[18]Plaintiff's counsel explained at the default judgment hearing that Plaintiff does not necessarily contend that Mr. Dooley *himself* profited from selling products to Columbus Container or Smurfit-Fresno after his termination from Plaintiff. Rather, Plaintiff contends that Mr. Dooley diverted Columbus Container and Smurfit-Fresno's business away from Plaintiff and allowed some third-party or parties to benefit from that diversion.

[19]Plaintiff's counsel stated at the default judgment hearing that the compensatory damages started to accrue on the date the T.R.O. went into effect and through the two-year period of Plaintiff's non-compete provision. Counsel indicated that would be the period May 13, 2005 through May 13, 2007. The Court notes, however, that the hearing on the Motion for T.R.O. was held on May 17, 2005 and that the T.R.O. (doc. 13) provided that the two-year non-compete provision began on April 9, 2005 and would run through April 9, 2007. Doc. 13 at p. 2. The Court therefore holds that the time period for which compensatory damages, if any, may be recovered is the period April 9, 2005 through April 9, 2007.

$35,000 is based on purchase records that Smurfit-Fresno produced in response to a subpoena that Plaintiff served after filing its Amended Application for Default Judgment.[20]

**B.      Testimony and Evidence Presented at the Default Judgment Hearing Regarding Compensatory Damages**

Plaintiff's president and owner, Brian Meitler, testified at the February 6, 2007 default judgment hearing about the purchasing history of Columbus Container and Smurfit-Fresno. Those two customers stopped purchasing their clay flocculents from Plaintiff in the spring of 2005, after Mr. Dooley's employment was terminated.

Mr. Meitler testified that, based on invoices and order forms produced by those customers in response to Plaintiff's subpoenas, during the period January 28, 2005 through August 11, 2006 (approximately nineteen months), Columbus Container purchased 38,500 pounds of clay flocculents, an average of 2,026 pounds per month. That figure is roughly equivalent to one pallet of clay flocculents per month. Plaintiff presented calculations showing that a customer's purchase of one pallet per month at 65 cents per pound[21] would result in a monthly profit to Plaintiff of $587.63.

Mr. Meitler also testified that during the period January 25, 2005 through October 27, 2006 (approximately twenty-one months), Smurfit-Fresno purchased 72,000 pounds of clay flocculents, an average of  two pallets per month. Plaintiff presented calculations showing that a customer's purchase of two pallets per month at 60 cents per pound[22] would have resulted in a monthly profit to Plaintiff of $909.47.

---

[20]*See* Default J. Hr'g Ex. 3.

[21]Plaintiff sold the clay flocculents to Columbus Container at 65 cents per month.

[22]Plaintiff sold the clay flocculents to Smurfit-Fresno at 60 cents per pound.

According to Mr. Meitler's testimony and the purchase orders, Columbus Container was a one-pallet per month customer and Smurfit-Fresno was a two-pallet per month customer. Consequently, as a result of Plaintiff's wrongful conduct, Plaintiff lost the profit from three pallets per month, or $1,497.10 per month. Taking that figure times the twenty-four month period of Mr. Dooley's non-compete provision, Plaintiff lost approximately $35,930 in profits.

Mr. Meitler also testified that Plaintiff has a history of retaining customers and that "for the most part we don't lose customers." Historically, any customer that Plaintiff has lost has been due to plant closings.

### C.    The Unanswered Requests for Admission

At the February 6, 2006 default judgment hearing, Plaintiff informed the Court that Plaintiff had served Mr. Dooley with a Second Set of Requests for Admission on November 2, 2006.[23] Mr. Dooley has never responded to the requests. Plaintiff contends that those unanswered requests for admission support its claims for compensatory damages in the amount of profits lost from sales to Columbus Container and Smurfit-Fresno.

At the hearing, the Court questioned whether the requests were served after the close of discovery, and therefore untimely. After reviewing the record more thoroughly, the Court determines that the requests for admission were in fact timely served. The Scheduling Order was

---

[23] *Id.* Ex. 4.

vacated pursuant to a January 5, 2006 Order.[24]   Thus, the December 15, 2005 deadline for completing discovery was no longer in effect.

Having determined that the requests were timely served, the Court must determine the effect of Mr. Dooley failing to respond to them.  Federal Rule of Civil Procedure 36 governs requests for admission.  In particular, Rule 36(a) states that "[e]ach matter of which an admission is requested shall be separately set forth.  The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter . . . ."[25]  Moreover, the Rule states that any matter admitted "is conclusively established unless the court on motion permits the withdrawal or amendment of the admission."[26]  Thus, it is well settled that "[u]nanswered requests for admissions are deemed admitted."[27]

Mr. Dooley has yet to file any responses to Plaintiff's request for admissions, even though the requests were served more than seven months ago.[28]  And, he has filed no motion to withdraw

---

[24]*See* Order to Show Cause (doc. 40) filed Jan. 5, 2006, in which the Court held: "As a result of Defendant's failure to appear for his deposition, the Court finds it necessary to vacate the current Scheduling Order. The Scheduling Order and all settings, including the May 30, 2006 trial setting, are hereby vacated.  If necessary, scheduling issues will be addressed at the January 23, 2006 hearing and a new Scheduling Order will be issued."  *Id.* at p. 2.

[25]Fed. R. Civ. P. 36(a)

[26]Fed. R. Civ. P. 36(b).

[27]*Bergemann v. U.S.*, 820 F.2d 1117, 1120 (10th Cir. 1987) (citations omitted).

[28]This does not appear to be a single instance in which Mr. Dooley may have inadvertently failed to meet a deadline due to some excusable hardship. From the Court's review of the case file, Mr. Dooley has engaged in a consistent pattern of neglect or even intentional disregard in meeting the time frames and requirements for conducting business in this Court.

the admissions.  The Court therefore finds that the matters contained therein have been admitted.

Accordingly, the following matters have been conclusively established:

- Columbus Container and Smurfit-Fresno are accounts to which Dooley formerly sold and serviced on behalf of Plaintiff.
- While Dooley sold products to Columbus Container and Smurfit-Fresno on behalf of Plaintiff, both customers were satisfied with the quality, pricing and performance of Plaintiff's products.
- While Dooley sold products to Columbus Container and Smurfit-Fresno on behalf of Plaintiff, neither customer ever complained to Dooley about the quality, pricing, or performance of Plaintiff's products.
- If Dooley had not been terminated by Plaintiff for cause, it was reasonably foreseeable that Columbus Container and Smurfit-Fresno would have continued to purchase products from Plaintiff indefinitely.
- In Dooley's experience, industrial waste water treatment customers are normally reluctant to switch from one manufacturer's clay flocculent products to another's products in the absence of dissatisfaction with performance or a significant price advantage from a competing product.
- In Dooley's experience, industrial waste water treatment customers, even when unhappy with a current supplier's clay flocculent product, will normally undergo months of trials and testing before switching to another's products.
- In Dooley's experience, it normally takes many months, or in some cases, several years, of customer calls, visits, and production demonstrations to gain an industrial waste water treatment customer's trust and confidence in another product and induce it to switch to another's products.

### D.    Other Evidence Presented by Plaintiff

Plaintiff also presented evidence through its Amended Application for Default Judgment

(doc. 45).  Attached to the Amended Application were unanswered requests for admissions relating

to competitors' telephone numbers[29] and telephone records establishing that Mr. Dooley had

contacted various of Plaintiff's competitors after his employment with Plaintiff was terminated.[30]

The phone records reveal that Mr. Dooley called Warren Short at Liquid Cleaning Processes on May

---

[29]See Ex. 2, attached to Am. Application for Default J. (doc. 45).

[30]See Ex. 3, attached to Am. Application for Default J. (doc. 45).

10, 2005.[31]  The subpoenaed records from Columbus Container show that Columbus Container purchased clay flocculents from Liquid Cleaning Processes on May 5 and 12, 2005.[32]  In addition, the phone records indicate that Mr. Dooley called Chuck Surges, the purchaser for Columbus Container, on April 28, 2005; May 8, 2005; May 24, 2005, and May 31, 2005.[33]

In addition, in support of the Amended Application for Default Judgment, Plaintiff provided the declaration of Brian Meitler, in which he stated that at the time (February 2006) Plaintiff had ninety-four satisfied industrial customers and that no Meitler customer had ever discontinued purchasing from Meitler due to dissatisfaction over its products or services.[34]

In his declaration, Mr. Meitler also stated that "if Mr Dooley had not encouraged Smurfit-Fresno and Columbus Container to stop buying from [Meitler], I believe that each of them would have continued purchasing from [Meitler] for an indefinite period, due to [Meitler's] high quality products that are priced below its major competitors."[35]

### E.     Applicable Law Regarding the Award of Damages on Default Judgment

Rule 55(b)(2) governs the entry of default judgment by the court.  It states:

If, in order to enable the court enter judgment or to carry it into effect, it is necessary to take into account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the

---

[31]*See* Ex. 2 & 3, attached to Am. Application for Default J. (doc. 45).

[32]*See* Default J. Hr'g Ex. 2.

[33]*See* Ex. 2 & 3, attached to Am. Application for Default J. (doc. 45).

[34]Decl. of Brian Meitler, ¶ 4, attached as Ex. 4 to Am. Application for Default J. (doc. 45).

[35]*Id.*, ¶ 6.

court may conduct such hearings or order such references as it deems necessary and proper . . . ."[36]

The Court ruled in its November 1, 2006 Memorandum and Order that an evidentiary hearing was necessary to determine the proper amount of Plaintiff's compensatory damages, which at the time Plaintiff claimed was in the amount of $25,400.00.   The Court was unable to rule, based on the record before it, that Plaintiff's compensatory damages were for a sum certain or capable of mathematical calculation or easy computation.  Moreover, the Court ruled that Mr. Dooley should have the opportunity to appear, and refute Plaintiff's calculation of its lost profits.

As the Court set out in its Memorandum and Order, the issue of Mr. Dooley's liability for breach of contract, conversion, and misappropriation of trade secrets has already been resolved in Plaintiff's favor by the entry of default.[37]   The issue of proximate cause has also been resolved in Plaintiff's favor, as "a default also effectively constitutes an admission that damages were

---

[36]Fed. R. Civ. P. 55(b)(2).

[37]Fed. R. Civ. P. 55(b)(2); *see also Goldman, Antonetti v. Medfit Int'l.*, 982 F.2d 686, 693 (1st Cir. 1993) ("[A]n entry of a default against a defendant establishes the defendant's liability."); *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) (entry of default judgment under Rule 37(b) conclusively established defendants' liability); *U.S. v. DiMucci*, 879 F.2d 1488, 1497 (7th Cir. 1989) ("As a general rule, a default judgment establishes, as a matter of law, that defendants are liable to plaintiff as to each cause of action alleged in the complaint."); *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (where default judgment entered pursuant to Rule 37(b), defendant deemed to have admitted plaintiff's well-pleaded allegations of fact); *U.S. v. Ware,* No. 96-2167-GTV, 1997 WL 383069, at *2 (D. Kan. June 18, 1997) ("once a court determines that a defendant is in default, the factual allegations in the plaintiff's complaint, other than damages, must be taken as true."); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 at 58-59 (3d ed. 1998).

proximately caused by the defaulting party's conduct; that is, the acts pleaded in a complaint violated the laws upon which the claim is based and caused injuries as alleged."[38]

The entry of default, however, does not resolve the issue of *the amount of damages*,[39] and the Court must ensure that there is a basis for the amount of the damages specified in the default judgment.[40]  "The burden remains upon plaintiffs to establish the amount of their damages which proximately resulted from the acts and conduct of the defaulted defendants."[41]  As the Second Circuit observed in *Trans World Airlines, Inc. v. Hughes*:[42]

> The outer bounds of recovery allowable are of course measured by the principle of proximate cause.  The default judgment did not give [plaintiff] a blank check to recover from [defendant] any losses it had ever suffered from whatever source.  It could only recover those damages arising from the acts and injuries pleaded and in this sense it was [plaintiff's] burden to show "proximate cause."  On the other hand, there was no burden on [plaintiff] to show that any of [defendant's] acts caused the well-pleaded injuries, except as we have indicated that it had to for the purpose of establishing the extent of the injury caused [plaintiff], in dollars and cents.[43]

---

[38]*Cablevision Sys. New York City Corp. v. Lokshin*, 980 F.Supp. 107, 111 (E.D.N.Y. 1997) (citing *Au Bon Pain Corp. v. Artect, Inc*., 653 F.2d 61, 65 (2d Cir. 1981)).

[39]*Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir. 1990) ("A consequence of the entry of a default judgment is that the factual allegations of the complaint, *except those relating to the amount of damages*, will be taken as true.") (emphasis added); *Beck  v. Atlantic Contracting Co., Inc*., 157 F.R.D. 61, 64 (D. Kan. 1994) ("Because the court has determined that defendant is in default, the factual allegations of plaintiff's complaint, *except those relating to the amount of damages,* will be taken as true.") (emphasis added).

[40]*Fustok v. ContiCommodity Servs. Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

[41]*Morales v. Farley,* No. 3:93CV0872 AS, 1996 WL 698027, at *7 (N.D. Ind. Oct. 30, 1996) (citing *Greyhound Exhibitgroup v. E.L.U.L. Realty*, 973 F.2d 155, 158-59 (2d Cir. 1992)).

[42]449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973).

[43]*Id*. at 70.

Later, in *Greyhound Exhibitgroup, Inc.*,[44] the Second Circuit explained that in the default judgment context, "the application of proximate cause presumes that liability has been established, and requires only that the compensation sought relate to the damages that naturally flow from the injuries pleaded."[45]

Applying these rules to this case, it is not necessary that Plaintiff prove that Mr. Dooley's unlawful conduct caused the injuries alleged in the Complaint, i.e., that Mr. Dooley's misconduct caused Plaintiff to lose the profits from sales to Columbus Container and Smurfit-Fresno.   Those injuries have already been established by virtue of the default.  To recover compensatory damages, however, Plaintiff must establish a reasonable basis upon which the Court can conclude that Plaintiff's lost profits are *in the amount claimed* by Plaintiff.

### F.        Determining the Amount of Plaintiff's Lost Profits

As a threshold matter, the Court must address Plaintiff's increased claim for compensatory damages.  As noted above, Plaintiff sought in its Amended Application for Default Judgment to recover compensatory damages in the amount of only $25,400.[46]   At the February 6, 2007 default judgment hearing, Plaintiff increased its claim for compensatory damages to $35,000.  Plaintiff's counsel explained at the hearing that the increased claim was based on new information contained in the purchase orders subpoenaed from Smurfit-Fresno.

---

[44]973 F.2d 155 (2d Cir. 1992).

[45]973 F.2d at 159.

[46]Plaintiff's "Summary" to the Amended Application stated:  "To render full and complete justice in this matter, the Court should . . . "[a]ward MCI $25,400 in compensatory damages."  Am. Application for Default J. (doc. 45) at p. 10.

Prior to the hearing, Plaintiff filed no pleading indicating that it was intending to increase its compensatory damage claim.  In addition, to the Court's knowledge, Mr. Dooley received no notice from Plaintiff that it planned to increase its claim.

The Court finds that under these circumstances it would be fundamentally unfair to Mr. Dooley to allow Plaintiff to enlarge its damage claim.  The Amended Application for Default Judgment led Mr. Dooley to believe that Plaintiff was seeking to recover only $25,400 in compensatory damages.  Mr. Dooley may have very well relied on that amount in determining whether he wanted to expend the time, effort, and money necessary to respond to the application for default judgment or to attend the default judgment hearing.  Consequently, the Court will not permit any compensatory damage award to exceed the $25,400 sum originally requested.

The Court will now determine whether Plaintiff is entitled to recover the $25,400 sum.  The court holds that Plaintiff has shown that there is a reasonable basis for Plaintiff to recover this sum and that the lost sales of Columbus Container and Smurfit-Fresno reasonably flow from Mr. Dooley's wrongful conduct.  The testimony presented at trial, in conjunction with the purchase records of Columbus Container and Smurfit-Fresno, provide a reasonable basis for the Court to conclude that Columbus Container was a one-pallet per month customer and Smurfit-Fresno was a two-pallet per month customer.  In addition, the trial testimony and unanswered Second Set of Requests for Admission establish that it was likely that Columbus Container and Smurfit-Fresno would have continued as customers of Plaintiff for the two-year non-compete period that followed Mr. Dooley's termination of employment.  Moreover, the Court finds that the testimony and purchase records reasonably establish that Plaintiff would have earned $14,103.16 in profits from Columbus Container and $21,827.28 in profits from Smurfit-Fresno, over that two-year period.

This would amount to a total of $35,930.40.  As that figure exceeds the $25,400 ceiling that the Court has placed on Plaintiff's compensatory damage recovery, the Court must reduce the award to $25,400.  Accordingly, the Court finds that Plaintiff is entitled to an award of $25,400 in compensatory damages.

## III.    Punitive Damages

### A.    Amount Sought by Plaintiff

Having determined that Plaintiff is entitled to recover compensatory damages, the Court will now determine the amount of Plaintiff's punitive damages.  In Count II of its Complaint, Plaintiff seeks punitive damages in excess of $75,000, based on Mr. Dooley's willful and malicious conversion.  In Count III,  Plaintiff seeks and additional award of exemplary damages in an unspecified amount based on Mr. Dooley's misappropriation of trade secrets.  In its Amended Application for Default Judgment and at the default judgment hearing, Plaintiff indicated it is seeking a total of $50,000 in punitive and exemplary damages.

### B.    Applicable Law

Plaintiff seeks punitive damages pursuant to K.S.A. 60-3702(c), which allows for the award of such damages where the factfinder determines the defendant has "acted toward the plaintiff with willful conduct, wanton conduct, fraud, or malice."[47]  Plaintiff also seeks exemplary damages pursuant to K.S.A. 60-3322(b), which provides for the award of exemplary damages for willful and

---

[47]K.S.A. 60-3702(d).

malicious misappropriation of trade secrets.  The statute limits the amount of exemplary damages

to no more than twice the amount of actual damages awarded for the misappropriation.[48]

K.S.A. 60-3702(a) sets forth the statutory scheme for awarding punitive damages under

Kansas law.  It provides as follows:

> In any civil action in which exemplary or punitive damages are recoverable, the trier
> of fact shall determine, concurrent with all other issues presented, whether such
> damages shall be allowed.  If such damages are allowed, a separate proceeding shall
> be conducted by the court to determine the amount of such damages to be awarded.[49]

At that separate proceeding to determine the amount, the Court may consider the seven

factors set forth in K.S.A. 60-3702(b):

> (1) The likelihood at the time of the alleged misconduct that serious harm would
> arise from the defendant's misconduct;
> (2) the degree of the defendant's awareness of that likelihood;
> (3) the profitability of the defendant's misconduct;
> (4) the duration of the misconduct and any intentional concealment of it;
> (5) the attitude and conduct of the defendant upon discovery of the misconduct;
> (6) the financial condition of the defendant; and
> (7) the total deterrent effect of other damages and punishment imposed upon the
> defendant as a result of the misconduct, including, but not limited to, compensatory,
> exemplary and punitive damage awards to persons in situations similar to those of
> the claimant and the severity of the criminal penalties to which the defendant has
> been or may be subjected.[50]

In addition, K.S.A.  60-3702(e) sets forth considerations for the Court in determining the

maximum amount of any punitive damages award.  It provides that any award of exemplary or

---

[48]K.S.A. 60-3322(b).

[49]K.S.A. 60-3702(a).  The evidentiary hearing held on February 6, 2007 regarding Plaintiff's
Amended Application for Default Judgment satisfied the statute's requirement that a hearing be held
to determine the amount of the punitive damages award.

[50]K.S.A. 60-3702(b).

punitive damages may not exceed the lesser of the defendant's annual gross income or five million dollars.[51]

As noted above, *liability* for the punitive damages has been established.  The Court has already ruled that Mr. Dooley acted willfully and maliciously in converting Plaintiff's website and the customer inquiries and leads directed at that website, and in misappropriating Plaintiff's trade secrets.  The Court therefore need only determine the *amount* of the punitive damages to be awarded.

### C.       Evidence and Testimony Presented

Plaintiff  has provided  persuasive information and argument regarding the various K.S.A. 60-3702(b) factors in its Amended Application for Default Judgment, the affidavit of Brian Meitler, and the testimony of Mr. Meitler at the default judgment hearing, all of which are discussed above in connection with compensatory damages.  Additionally, testimony from Mr. Meitler at the hearing revealed that Plaintiff has expended much effort and time in cultivating new businesses, and, that in Plaintiff's business, gaining new customers is typically difficult and time-consuming.

### D.       Analysis

#### 1.       Analysis of the K.S.A. 60-3702(b) factors

##### a.       The likelihood at the time of the alleged misconduct that serious harm would arise

The Court finds  it was very likely that Mr. Dooley's refusal to (1) change the website so that all inquires went directly to Plaintiff and not to Defendants; (2) provide Plaintiff with the password necessary to make changes to the website; and (3) relinquish system administrator control of the

---

[51]K.S.A. 60-3702(e).

website to Plaintiff, would result in Plaintiff being deprived of receiving the customer inquiries and customer leads generated by Plaintiff's website and would defeat the purpose for which the website was created.  It is obvious that this would result in Plaintiff losing current and new business.  It was also likely that after Mr. Dooley's post-termination solicitation of business for waste water treatment on behalf of himself and/or his own company, East Texas (which was in competition with Plaintiff), would result in Plaintiff losing customers and business.  Similarly, Mr. Dooley's contacts with Plaintiff's customers to divert their business from Plaintiff would result in Plaintiff losing customers and business, customers that Plaintiff had expended significant time and efforts in recruiting and maintaining.  This factor weighs in favor of a substantial punitive damages award, as requested by Plaintiff.

> b.      *The degree of the defendant's awareness of the likelihood of harm*

It is undisputed that Mr. Dooley was aware of the likelihood that his misconduct would injure Plaintiff.  In signing the Brokerage Agreement, Mr. Dooley acknowledged and stipulated that a violation of paragraphs 7 or 9 (paragraphs that survived termination of the Brokerage Agreement) "would result in immediate and irreparable injury" to Plaintiff.[52]  Also, in signing the Employment Agreement, Mr. Dooley expressly stated that he understood the services he would render under the Agreement were "of a special, unique and extraordinary character," and he acknowledged that any breach of the Employment Agreement would cause Plaintiff "irreparable harm and damage for

---

[52] ¶ 13, Brokerage Agreement, attached as Ex. 1 to Compl. (doc. 1); ¶ 6.f., Employment Agreement, attached as Ex. 2 to Compl.

which money damages would not provide an adequate remedy."[53]    Thus, this factor also weighs in favor of a substantial punitive damages award.

### c.      *The profitability of the defendant's misconduct*

Because Mr. Dooley failed to answer Plaintiff's discovery requests, refused to appear for his deposition, and failed to attend the default judgment hearing, the extent to which he, or his company, East Texas, profited from his misconduct is not known.  The fact that Plaintiff's evidence on this factor is incomplete or even non-existent due to Mr. Dooley's failure to participate in the action should not, however, defeat Plaintiff's claim for punitive damages.  As Chief Judge John Lungstrum stated in *Beck v. Atlantic Contracting Company, Inc.,*[54] "[t]he court does not believe that a defendant's default, resulting in a plaintiff's inability to discover evidence on each of the criteria spelled out in K.S.A. 60-3702(b), should result in barring a plaintiff from the recovery of punitive damages."[55]  To hold otherwise would effectively reward Mr. Dooley for his refusal to participate in discovery and his utter failure to defend this action.

Although it is not possible to quantify the profitability of Mr. Dooley's misconduct given the limited record, the Court is willing to infer that, at the very least, Mr. Dooley's motive was economic and that he received some benefit and/or profit from his misconduct.  This factor therefore militates in favor of a substantial punitive damages award.

---

[53]*Id.*

[54]No. 93-2480-JWL, 1994 WL 608598 (D. Kan. Oct. 14, 1994).

[55]*Id.* at *1.

23

> d.    The duration and concealment of the misconduct and the defendant's
>        attitude and conduct upon discovery of the misconduct

Accepting as true the allegations of the Complaint, the Court finds that Mr. Dooley breached the Website Contract from the time he created the website in the fall of 2004.  From the inception of the website, he failed to refer hundreds of customer inquiries and leads to Plaintiff, and instead designed the website so that all inquires went directly to himself and Defendant East Texas.  Despite Plaintiff's specific instructions to Mr. Dooley that he refer all inquiries and leads to Plaintiff and that he relinquish control over the website, Mr. Dooley wrongfully maintained exclusive access of the website, even after his termination in April 2005.  Furthermore, the telephone records reveal that Mr. Dooley  made telephone calls to Plaintiff's customers, in breach of the Brokerage and Employment Agreements even after the lawsuit was filed, and he continued to make them even after the T.R.O. was entered.  Finally, evidence presented at the default judgment hearing revealed that as of the date of the hearing, February 6, 2007 — which was twenty months *after* the entry of the T.R.O. — Mr. Dooley was still advertising his company, East Texas, on the Internet, in violation of the T.R.O. These facts weigh in favor of a large punitive damages award.

> e.    The financial condition of the defendant

Under this factor, the Court may consider the defendant's current financial condition, including his net worth.[56]  Plaintiff attempted to discover information about Mr. Dooley's financial condition in its Second Set of Interrogatories and Second Set of Requests for production, which were served on Mr. Dooley on November 2, 2006, after the entry of default.  The requests sought such pertinent materials as Mr. Dooley's income tax returns, pay statements, and bank statements.  The

---

[56]*Heartland Surgical Specialty Hosp., LLC v. Midwest,* No. 05-2164-MLB-DWB, 2007 WL 950282, at *14 (D. Kan. Mar. 26, 2007).

24

interrogatories sought information regarding his prior employment and self-employment, other sources of income, and any real estate owned. Both the interrogatories and the requests for production clearly stated that Mr. Dooley's "[f]ailure to respond may result in adverse inferences being taken against you in any upcoming hearing concerning punitive damages." The discovery requests have not been answered.[57]

Plaintiff asks the Court to apply the adverse inference rule in determining Mr. Dooley's financial condition. The adverse inference rule provides that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him."[58] Kansas courts have applied this rule in the punitive damages context and will "make an adverse inference against the recalcitrant party in assessing punitive damages."[59]

For the adverse inference rule to apply, the following must be shown: "(1) it appears the documentary evidence exists or existed; (2) the suppressing party has possession or control of the evidence; (3) the evidence is available to the suppressing party, but not to the party seeking production; and (4) it appears that there has been actual suppression or withholding of evidence."[60]

The Court holds that the adverse inference rule should apply here. The financial records and information exist, they are in the control of Mr. Dooley, they are not available to Plaintiff, and Mr.

---

[57]Default J. Hr'g Ex. 5 (Second Set of Requests for Production); Default J. Hr'g Ex. 6 (Second Set of Interrogatories).

[58]*Wardrip v. Hart,* 949 F. Supp. 801, 804 (D. Kan. 1996).

[59]*Super Film of America, Inc. v. UCB Films, Inc.,* No. 02-4146-JPO, 2005 WL 2367546, at *17 (D. Kan. Sept. 27, 2005). *Accord Waldrip,* 949 F. Supp. at 804.

[60]*Waldrip*, 949 F. Supp. at 804 (citing *Gilbert v. Cosco Inc*., 989 F.2d 399, 406 (10th Cir. 1993)).

Dooley has failed to provide them in response to the discovery requests.  In addition, Mr. Dooley refused to appear for his deposition, at which time Plaintiff would have inquired about his financial status.

While Mr. Dooley has stated in his Answer that  he has no savings or "real assets," and is unemployed and cannot afford legal representation,[61] he has failed to provide that information in any sworn affidavit or declaration under the penalty of perjury.  Also, Mr. Dooley chose not to appear at the default judgment hearing, at which time he could have presented evidence regarding his financial status.  The Court forewarned Mr. Dooley in its November 1, 2006 Memorandum and Order that a punitive damages award of  fifty thousand dollars appeared reasonable based on the evidence then before the Court.[62]  Moreover, the Court stated in its Memorandum and Order that it would hold a default judgment hearing "to insure that Mr. Dooley is given the opportunity to present evidence" with respect to his financial condition, in addition to the other factors.[63]

In light of the above, the Court does not believe it is unfair to apply the adverse inference rule here.  Applying that rule, the Court finds that Mr. Dooley's financial condition is not such that he would be unable to pay a substantial punitive damages award.

---

[61]*See* Answer (doc. 5), ¶ 1.

[62]Mem. and Order (doc. 47) at p. 15.

[63]*Id*. at p. 14.

*f.      The total deterrent effect on the defendant*

This factor typically looks to whether the party against whom punitive damages are to be assessed will be required to pay, or has already paid, actual or compensatory damages to the plaintiff and will be, or has been, punished in another proceeding, such as a criminal proceeding.[64]

The only damages or "punishment" that Mr. Dooley will incur is the $25,400 compensatory damages awarded in this Order.  Consequently, this factor, like the other factors discussed above, weighs in favor of a substantial punitive damages award, and the Court believes that the sum of $50,000 suggested by Plaintiff would be reasonable.

2.      *Analysis under K.S.A. 60-3702(e)*

Before the Court may award this sum, however, the Court must insure that it does not exceed the ceiling set forth in K.S.A. 60-3072(e).  That subsection sets the following limitation on the amount of punitive damages that may be awarded:

> No award of punitive damages may exceed the lesser of:  (1) the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded, unless the court determines such amount is clearly inadequate to penalize the defendant, then the court may award up to 50% of the net worth of the defendant, as determined by the court; or (2) $5 million.[65]

K.S.A. 60-3702(e)(1) provides that the Court may exceed the annual gross income earned by the defendant for any one of the five years preceding the wrongful conduct if the Court

---

[64]*Super Film,* 2005 WL 2367546 at *17.

[65]K.S.A. 60-3702(e).

determines that such amount is clearly inadequate to penalize the defendant.  If the Court so finds, then the court may award up to 50% of the net worth of the defendant, as determined by the court.[66]

In light of the above, to make a proper determination of the amount of punitive damages, the Court needs to know Mr. Dooley's annual income for the five years preceding his wrongful conduct. This evidence is lacking due to Mr. Dooley's refusal to provide discovery and his failure to appear at the default judgment hearing.  The record does reveal, however, that during the period of his employment with Plaintiff (from September 2004 to April 2005, which would fall within the relevant five-year time period), Mr. Dooley earned three thousand dollars per month plus benefits.[67] Plaintiff represented at the default judgment hearing that this brought Mr. Dooley's compensation package — when annualized —  to $48,000.

While there is no direct evidence showing that Mr. Dooley actually earned $48,000 over the course of an entire year during the relevant five-year period, the Court believes that the adverse inference rule should apply here.  Applying that rule, and taking into consideration the evidence regarding Mr. Dooley's salary while employed by Plaintiff, the Court will assume that Mr. Dooley had a gross annual income of $ 48,000 in at least one of the relevant years.  Consequently, the Court holds that the punitive damages award may not exceed $48,000.

### 3.   Analysis under the Kansas Trade Secrets Act

As noted above, Plaintiff contends that it is entitled to punitive damages under K.S.A. 60-3322(b) of the Kansas Trade Secrets Act.  That statute provides for the recovery of exemplary

---

[66]K.S.A. 60-3702(e)(1).

[67]This is supported by Mr. Dooley's Employment Agreement, attached as Ex. B. to Compl. (doc. 1).

damages for willful and malicious misappropriation of trade secrets, and allows the plaintiff to recover as much as twice the amount of actual damages awarded for the misappropriation.[68] Plaintiff relies on this statute to support its argument that it should recover $50,000 in punitive damages, as that sum is approximately twice the amount of the compensatory damages being awarded.

The Court has already held that Plaintiff is entitled to recover $48,000 in punitive damages under the analysis set forth in K.S.A. 60-3702.  The Court will not increase that amount to the $50,000 sum requested by Plaintiff under K.S.A. 60-3322 of the Kansas Trade Secrets Act.  Any award of exemplary damages under the Kansas Trade Secrets Act is governed by the limitations imposed by K.S.A. 60-3702, as that statute, by its express terms, applies "[i]n *any civil action* in which exemplary or punitive damages are recoverable."[69]  Consequently, the Court must decline to increase the punitive damages award so that it is equivalent to twice the compensatory damages award.

### E.       Conclusion as to Punitive Damages

In arriving at an amount of punitive damages sufficient to punish Mr. Dooley for his conduct, and to deter him and others from similar conduct in the future, the Court has considered the factors enumerated in K.S.A. 60-3702, as well considerations under K.S.A. 60-3322.  The Court has also considered the nature of the conduct which gave rise to Mr. Dooley's punitive damage liability in light of all of the evidence in the record.

The Court finds that Mr. Dooley has been given ample opportunity to present evidence regarding the various factors enumerated in K.S.A. 60-3702(b) and to provide information regarding

---

[68]K.S.A. 60-3322(b).

[69]K.S.A. 60-3702(a) (emphasis added).

his annual income as it is pertinent to K.S.A. 60-3702(e).  For whatever reasons, Mr. Dooley has

failed to provide any of this information.  After taking into account all of the evidence, the statutory

considerations, and relying on the adverse inference rule where necessary, the Court determines that

the sum of $48,000 is sufficient to accomplish the purposes of a punitive damage award.  The Court

will therefore assess punitive damages against Mr. Dooley the sum of  $48,000.

## IV.    Injunctive Relief

The Prayer for Relief in Plaintiff's Complaint seeks an order "enjoining Defendants from

violating any of the restrictive covenants and confidentiality provisions of the Brokerage Agreement

and Employment Agreement."[70]   The Complaint alleges the following with respect to those

restrictive covenants and confidentiality provisions:

1. Pursuant to Paragraph 7 of the Brokerage Agreement, Mr. Dooley agreed to refrain from manufacturing or selling any competing products for one year after termination of the Brokerage Agreement and from soliciting any of Plaintiff's customers for two years after termination of the Brokerage Agreement;[71]

2. Pursuant to Paragraph 9 of the Brokerage Agreement, Mr. Dooley agreed not to use or disclose any of Plaintiff's confidential information for an indefinite period of time;[72]

3. On September 16, 2004, the parties, by mutual agreement, terminated the Brokerage Agreement, and Mr. Dooley entered into an Employment Agreement with Plaintiff;[73]

---

[70]Compl. (doc. 1), Prayer for Relief, ¶g.

[71]*Id*., ¶¶14-15.

[72]*Id*., ¶¶ 16-18.

[73]*Id*., ¶ 30.

4.      The Employment Agreement provided that the restrictive covenants and confidentiality provisions of the Brokerage Agreement would survive termination of the Brokerage Agreement;[74]

5.      In addition to the restrictive covenants to which Mr. Dooley agreed in the Brokerage Agreement and which remained in effect, Mr. Dooley further agreed in Paragraph 6.a of the Employment Agreement not to operate, own, control, participate in, consult with, or be employed by any competitor of Plaintiff in Kansas and nine other specified states, for a period of one year after termination;[75]

6.      Mr. Dooley also agreed in Paragraph 6.c of the Employment Agreement not to solicit, divert, take away or attempt to take away any person or entity that was a customer of Plaintiff, for a period of two years after termination; and[76]

7.      Mr. Dooley also agreed in Paragraph 4 of the Employment Agreement not to use or disclose any of Plaintiff's confidential information, for an indefinite period.[77]

Plaintiff filed its Motion for T.R.O. (doc. 2) on April 20, 2005, and Judge Lungstrum granted

the motion and entered a T.R.O. in a May 18, 2006 Order.[78]   The T.R.O. was entered after Judge

Lungstrum held an evidentiary hearing, at which time he heard testimony from Brian Meitler.

---

[74]*Id.*, ¶ 31.

[75]*Id.*, ¶ 35.

[76]*Id.*  The Court notes that the Complaint contains an apparent typographical error, as it states that the Employment Agreement's solicitation restriction is for only *one* year following termination. The Employment Agreement (attached as Ex. B to the Compl.) expressly states that the restriction lasts for *two* years.  In addition, the evidence presented at the hearing on Plaintiff's Motion for T.R.O. was consistent with the Employment Agreement.  Finally, Mr. Dooley failed to respond to a request for admission that the Employment Agreement (which was attached to the request and which was a copy of the same document attached to the Complaint) was a true and correct copy of the Employment Agreement that he had entered into with Plaintiff.  Thus, there is no dispute that the Employment Agreement contains a *two-year* restriction against solicitation.

[77]*Id.*, ¶36.

[78]*See* T.R.O. (doc. 13).

Although Mr. Dooley did not appear at the hearing, he was given notice and the opportunity to appear.[79]

In its Amended Application for Default Judgment, Plaintiff requests that an injunction be entered as set forth in Paragraphs 1-3 of the T.R.O.  Those paragraphs of the T.R.O. read as follows:

> Mr. Dooley is hereby enjoined and restricted from engaging in the following conduct until further order of the court:
>
> 1. ***until April 9, 2006***, from directly or indirectly operating, owning, control-ling, participating in, consulting with, being connected with, or being employed by any other competitor of [Plaintiff] Meitler and from selling any competing clay-based flocculent not manufactured by [Plaintiff] Meitler within the states of Kansas, Arkansas, Missouri, Iowa, Illinois, Indiana, Nebraska, Oklahoma, California, or Texas; from employing, contracting to employ, or soliciting from employment any person employed by [Plaintiff] Meitler between April 9, 2004, and April 9, 2005; and from manufacturing any clay-based flocculent; and
>
> 2. ***until April 9, 2007***, from directly or indirectly, on his own behalf, or in conjunction with any other person, partnership, firm, or corporation soliciting, diverting, taking away, or attempting to take away any person, partnership, firm, or corporation (or their business or patronage) that was a customer of [Plaintiff] Meitler between April 9, 2004, and April 9, 2005; and
>
> 3. from directly or indirectly divulging or disclosing, for any purpose whatso-ever, any of the confidential information that has been obtained by or disclosed to him by [Plaintiff] Meitler, including but not limited to customer lists, pricing lists, manufacturing formulas and blends, and sources of supply . . . .[80]

Paragraph 1 of the T.R.O. enforces the one-year restrictions and covenants of the Brokerage and Employment Agreements, while Paragraph 2 of the T.R.O. enforces the two-year restrictions and covenants of the Agreements.  Those restrictions and covenants went into effect upon Mr.

---

[79]*See* Mot. for T.R.O. (doc. 2); Order Setting Hr'g on Mot. for T.R.O. (doc. 6); T.R.O. (doc. 9).

[80]T.R.O. (doc. 13) at p. 2 (emphasis added).

Dooley's termination of employment on April 9, 2005.  Paragraph 3 of the T.R.O. enforces the non-disclosure provisions contained in Paragraph 9 of the Brokerage Agreement and Paragraph 4 of the Employment Agreement.  Those provisions have no time restrictions.

The Court holds that Plaintiff is not entitled to any injunction in connection with the covenants and restrictions that are addressed in Paragraphs 1 and 2 of the T.R.O., as those covenants and restrictions ran only for one or two years from the date of Mr. Dooley's termination, and were no longer enforceable after either April 9, 2006 or April 2007.  The Court does, however, hold that Plaintiff is entitled to an injunction with respect to the non-disclosure provisions of the Agreements, which are addressed in Paragraph 3 of the T.R.O., as those provisions were for an indefinite period of time.

The Court will therefore enter the following injunction:  Mr. Dooley is hereby enjoined and restricted from directly or indirectly divulging or disclosing, for any purpose whatsoever, any of the confidential information that has been obtained by or disclosed to him by Plaintiff, including but not limited to customer lists, pricing lists, manufacturing formulas and blends, and sources of supply.

## V.    Attorney Fees

Plaintiff requests in its Amended Application for Default Judgment that it be allowed to recover its attorney fees pursuant to K.S.A. 60-3323, which provides for the award of reasonable attorney fees to a party prevailing on a trade secret misappropriation claim where "willful and malicious misappropriation exists."[81]

The Court, in its November 1, 2006 Memorandum and Order, accepted as true Plaintiff's allegation that Mr. Dooley acted maliciously in misappropriating Plaintiff's trade secrets, and held

---

[81]K.S.A. 60-3323.

that Plaintiff is entitled to recover its reasonable attorney fees pursuant to K.S.A. 60-3323.  The

Court directed Plaintiff to file an application for attorney fees and supporting evidence, and directed

that it be filed within ten days of the conclusion of the default judgment hearing.  The Court's Order

indicated that Mr. Dooley would have ten days thereafter to file any opposition to the application.

Plaintiff filed its application and supporting materials on February 20, 2007 (doc. 53).

Plaintiff's counsel, prior to submitting the application, and in compliance with D. Kan. Rule 54.2,[82]

attempted to consult with Mr. Dooley to reach an agreement regarding the amount of fees to be

awarded.  Mr. Dooley, however, did not respond to Plaintiff's counsel, nor did he file any opposition

to the application.

Plaintiff requests that it be awarded attorney fees in the amount of $68,546.91. The Court

finds that Plaintiff's request is adequately supported by the declaration of Plaintiff's counsel and the

attached billing records.  The Court has reviewed the application and supporting materials in light

of the factors set forth in Kansas Rule of Professional Conduct 1.5.[83]  The Court finds the amount

to be reasonable and will award Plaintiff $68,546.91 in attorney fees.

---

[82]D. Kan. Rule 54.2 sets forth the procedure that a party seeking statutory attorney fees should follow, and requires, *inter alia*, that the moving party consult, or attempt to consult, with the opposing party to reach an agreement as to the amount of fees.

[83]Kansas Rule of Professional Conduct 1.5 sets forth the factors to be considered in determining the reasonableness of a fee.  The Kansas Rules of Professional Conduct have been adopted as the "applicable standards of professional conduct" for lawyers appearing in this Court. *See* D. Kan. Rule 83.6.1.

## VI.    Costs

Federal Rule of Civil Procedure 54(d)allows the prevailing party to recover its costs.  As Plaintiff is the prevailing party here, the Court holds that Plaintiff is entitled to recover its costs. Plaintiff shall file its bill of costs in accordance with D. Kan. Rule 54.1.

## VII.   Dismissal of East Texas

As noted above, nothing in the record indicates that Plaintiff has ever served Defendant East Texas, and East Texas has never entered its appearance in the case.  Accordingly, the Court finds it proper to dismiss all claims against East Texas, with prejudice, for failure to prosecute, pursuant to Federal Rule of Civil Procedure 41(b).

**IT IS THEREFORE ORDERED** that default judgment is entered in favor of Plaintiff and against Defendant Gary L. Dooley, for:

(1)    compensatory damages in the amount of $25,400.00;

(2)     punitive damages in the amount of $48,000.00; and

(3)    attorney fees, pursuant to the Kansas Trade Secrets Acts, in the amount of $68,546.91.

**IT IS FURTHER ORDERED** that Defendant Gary L. Dooley is hereby enjoined and restricted from directly or indirectly divulging or disclosing, for any purpose whatsoever, any of the confidential information that has been obtained by or disclosed to him by Plaintiff, including but not limited to customer lists, pricing lists, manufacturing formulas and blends, and sources of supply.

**IT IS FURTHER ORDERED** that Plaintiff is entitled to recover its costs against Defendant Gary L. Dooley.

**IT IS FURTHER ORDERED** that all claims against Defendant East Texas Environmental

Services, a/k/a ET Solutions, are dismissed with prejudice, for lack of prosecution.

**IT IS SO ORDERED**.

Dated in Kansas City, Kansas on this 26th day of June 2007.


                                                    s/ David J. Waxse
                                                    David J. Waxse
                                                    U.S. Magistrate Judge

cc:      All counsel and *pro se* parties

36